**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0005n.06

**No. 09-6036**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LISA WEATHERBY,

      **Plaintiff-Appellant,**

v.

FEDERAL EXPRESS,

      **Defendant-Appellee.**

                            /

**FILED**

**Jan 05, 2012**

LEONARD GREEN, Clerk

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE**

BEFORE:    BOGGS and CLAY, Circuit Judges; TARNOW, District Judge.[*]

      **CLAY, Circuit Judge.**  Plaintiff Lisa Weatherby appeals the grant of summary judgment

to Defendant Federal Express in her suit alleging racial and gender discrimination, hostile work

environment, and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-

5(g); and age discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29

U.S.C. § 621 *et seq.*  For the reasons that follow, we **AFFIRM** the decision of the district court.

**BACKGROUND**

      Lisa Weatherby was hired as a customer service agent ("CSA") by Defendant Federal

Express ("FedEx") in 1990.  On January 29, 2004, Plaintiff was offered a promotion to the position

---

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

of operations manager, which she accepted. Plaintiff began working as an operations manager in Nashville, Tennessee on March 1, 2004.

Plaintiff's duties as operations manager involved supervising CSAs at two Nashville stations, identified as "BNA" and "MQY." The stations were located approximately ten miles apart, and each employed approximately ten CSAs. Plaintiff was supervised in this position by senior managers Susan Shurling, at MQY, and Dean Mudd, at BNA. Shurling and Mudd were supervised by managing director Jeffrey Walker.

According to a memorandum from FedEx management to the Nashville operations managers, the responsibilities of the position included auditing employee timecards, making employee schedules, ensuring best practices of employees, conducting group meetings, and checking trucks for proper cleanliness and supplies. (R. 31-19: 6/10/04 Memo to Managers.)

On March 9, 2005, Plaintiff received a "Performance Reminder with Action Plan" from Mudd. The basis of the Performance Reminder was that Plaintiff "allow[ed] an employee to work over 60 hours during a work week," in violation of the FedEx policy that caps hours worked per week at 55. (R. 26-4: 03/09/05 Letter.) The letter purported to be issued in accordance with FedEx Performance Improvement Policy 2-50 ("Performance Policy"). (*Id.*)

On April 5, 2005, Plaintiff received a second Performance Reminder from Mudd. The basis of this reminder was "improper CASH handling procedures." (R. 26-4: 04/05/05 Letter). The letter stated that Plaintiff had been previously counseled regarding improper cash handling, and required Plaintiff to present a "written personal performance agreement" to management outlining the steps that she promised to take toward improvement. (*Id.*) The letter also warned that, pursuant to the

Performance Policy, the receipt of three Performance Reminders within a 12-month period "normally results in termination." (*Id.*)

On June 7, 2005, Plaintiff was issued a "written counseling" from Mudd. The letter stated that Plaintiff failed to schedule a courier to cover two open routes at BNA; and arrived late to a disciplinary meeting for one of her CSA supervisees. (R. 26-4: 06/07/05 Letter.) The letter concluded with Mudd expressing his concerns regarding Plaintiff's performance and suggesting that Plaintiff "strongly consider a non-Management position within FedEx and work on developing the necessary leadership skills to be successful." (*Id.*)

The next day, June 8, 2005, Plaintiff met with Mudd and Shurling about her performance issues. Plaintiff claims that Mudd and Shurling offered three options to her during the meeting: "(1) accept a demotion, (2) take a ninety-day leave of absence without pay to pursue other positions with FedEx, or (3) be terminated." (Pl.'s Br. at 7.) At the conclusion of the meeting, Shurling presented Plaintiff with a letter, which stated in its entirety:

> I, Lisa Weatherby request a 90-day leave of absence effective immediately. I would like to step down from my current Management position to pursue a non-management position, preferably in Memphis, TN, but not limited to Memphis.

(R. 31-6: 06/08/05 Letter.)

Though this letter is signed by Plaintiff, Plaintiff denies any recollection of signing the letter, and testified that she believed that Shurling may have forged her signature on the letter. (R. 26-4: Weatherby Dep. at 254–56.) Following the meeting, Plaintiff requested an internal Equal Employment Opportunity ("EEO") complaint form from a human resources manager. (Pl.'s Br. at 8.)

3

On approximately June 14, 2005, Plaintiff traveled to Memphis to discuss her employment options with Walker. Plaintiff alleges that Walker attempted to dissuade her from filing an internal EEO complaint by saying that doing so "would only cause problems between [her] two bosses," and noting that "hell, it has to come through me anyway." (R. 26-4: Weatherby Dep. at 355–57.) The meeting concluded with Walker presenting Plaintiff with three options for continued employment with FedEx, which largely mirrored the options previously offered by Shurling and Mudd: 1) Plaintiff could "return to her current management position at BNA, Nashville, 2) accept an hourly position, resulting in demotion, [or] 3) submit a voluntary 90-day leave w/o pay to seek employment [in other FedEx departments]." (R. 26-4: 06/17/05 EEO Compl.) Plaintiff informed Walker that she would like to return to the BNA station in her position as operations manager, which she did, after taking a week of paid leave. (R. 26-4: Weatherby Dep. at 359–61.) Upon her return to Nashville, Plaintiff discovered that she was no longer tasked with managing the MQY station, although neither her pay nor her job duties had been otherwise altered.

On June 17, 2005, Plaintiff filed an internal EEO complaint with FedEx. In the complaint, she alleged discrimination on the basis of race, sex, and age, in the form of a change in the terms and conditions of her employment, demotion, disciplinary action, harassment, threats, coercion, and intimidation. (R. 26-4: 06/17/05 EEO Compl.) In the complaint, Plaintiff specified that she received "direct intimidation, coercion and retaliatory threat by . . . Mudd via phone call upon being informed of my intent to fill [sic] an EEO discrimination complaint." (*Id.*)

The complaint outlined several instances wherein Plaintiff stated that she felt that she had been treated differently and more harshly than other employees, but Plaintiff identified the basis of

this treatment as "personal differences and vendettas" and stated that much of the perceived unfairness stemmed from her "work background (corporate only) and lack of DGO [Domestic Ground Operation] experience." (*Id*.) Plaintiff stated that management made disparaging remarks regarding her performance deficiencies in the presence of other employees, that Mudd referred to her as the "special manager" due to her lack of DGO experience, and that she had been given Performance Reminders without having been provided proper training or additional support. (*Id*.)

Plaintiff also stated that, in April 2004, a FedEx employee in full uniform approached her vehicle near the MQY station and "proceed[ed] to question who [she] was," which she perceived as "harassing." (*Id.*) Plaintiff wrote that she felt that the employee "discriminated against [her] for [her] race and could not believe that [she] was a manager there." (*Id.*) Plaintiff concluded the complaint with the following statement:

> I need the opportunity to be in an environment where I can be successful and accept challenges again without feeling inferior to my counterparts or feeling that I will always have to work harder than my peers to prove that I am capable as an African American female of achieving or exceeding standards and expectations towards performance excellence.

(*Id.*)

On June 21, 2005, Plaintiff received another counseling letter from Mudd. This letter alleged that Plaintiff had allowed certain supervisees to work without taking a yearly safety certification, and that Plaintiff had allowed a supervisee to leave a disciplinary meeting without completing a required Personal Performance Agreement. (R. 26-4: 06/21/04 Letter.) The letter also reiterated the concerns raised in Plaintiff's previous Performance Reminders and counseling letters. All of the instances discussed in this counseling letter pre-dated Plaintiff's June 14, 2005 meeting with Walker and

decision to return to Nashville, though Mudd had held the letter until Plaintiff's return. (R. 26-4: Mudd Dep. at 79–81.)

On August 1, 2005, FedEx issued an investigative report on Plaintiff's June 17 internal EEO complaint, in which it concluded that none of Plaintiff's allegations could be verified. (R. 31-3: Inter-Office Memo.)

On August 3, 2005, Plaintiff discovered that one of her supervisees, Georgette Pennic, had been falsifying her timecards by altering her scheduled start time to match the actual time that she clocked-in to her shifts, in order to cover her lateness. Plaintiff, as Pennic's direct manager, had been certifying these falsified timecards for several months.[1] After Plaintiff reported Pennic to management, Mudd discovered that another one of Plaintiff's employees had also been falsifying timecards, and that these discrepancies had gone unnoticed by Plaintiff for at least a month. (R. 26-4: 08/18/05 Letter.) On August 16, 2005, Plaintiff was suspended pending an investigation into her possible violation of the FedEx Acceptable Conduct Policy. (R. 26-4: 08/26/05 EEO Compl.) On August 18, 2005, Plaintiff was issued a third Performance Reminder for not properly auditing the timecards of her employees. (R. 26-4: 08/18/05 Letter.)

Plaintiff admits that she "did not 'catch' falsification activity, simply because [she] did not look for this activity due to not actually performing the actual audits," which she had delegated to a "team lead." (*Id.*) Nonetheless, Plaintiff alleges that, though all managers were overlooking

---

[1]There is no allegation that Plaintiff certified Pennic's timecards in order to deceive FedEx or was in any way complicit in Pennic's fraud.

timecard falsification by their supervisees, she was the only manager who received disciplinary action as a consequence. (*Id.*)

On August 18, 2005, Plaintiff was terminated from FedEx for receiving three Performance Reminders within a 12-month period. Plaintiff claims that, during her termination meeting, Mudd commented, "I told you that you would not make it," "I knew you could not do it," and "this is why I told you not to come back!" (*Id.*) Upon being terminated, Plaintiff filed an internal grievance—known as a Guaranteed Fair Treatment ("GFT") complaint—with FedEx regarding the circumstances of her termination. (Pl.'s Br. at 12.)

On August 24, 2005, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") complaint with the Tennessee Human Rights Commission. (R. 31-11: THRC Compl.) Plaintiff charged discrimination based on race, sex, age, and retaliation.[2]

Plaintiff filed a second internal EEO complaint with FedEx on August 26, 2005. In the complaint, Plaintiff claimed that she experienced termination, retaliation, disciplinary action, and harassment on the basis of her race, sex, age, and religion. (R. 26-4: 08/26/05 EEO Compl.) The complaint specifically alleged that Plaintiff was the victim of "retaliatory actions made by [her] manager as a result of filing an EEO Discrimination/Harassment Complaint." (*Id.*) In the complaint, Plaintiff reported that on June 13, 2005, Mudd asked her, "Do you think Jeff [Walker] will help you if you file a complaint?" Mudd then said, "Nobody will help you!" (*Id.*) Mudd also reportedly said to Plaintiff, "You know what will happen if you come back!" (*Id.*) Plaintiff further claimed that her

---

[2]The EEOC issued a Right to Sue letter on June 28, 2007.

termination was in violation of FedEx policy, which she interpreted to bar FedEx from taking any disciplinary action against an employee while the employee has an EEO complaint pending. (*Id.*)

Nowhere in the narrative of Plaintiff's internal EEO complaint does she mention gender, race, religion, or age, or attribute any of the actions that she reports to one of these characteristics. On the contrary, Plaintiff appears to attribute her allegedly different treatment to having been "simply put in an environment were [sic] not having prior work experience with no manager to mentor, coach and develop [her] was detrimental to [her] success in [the] position." (*Id.*)

On October 11, 2005, FedEx issued an investigative report on Plaintiff's August 26, 2005 internal EEO complaint, in which it concluded that each of Plaintiff's allegations was without merit, or could not be verified. (R. 31-3: Inter-Office Memo II.)

After Plaintiff was terminated, FedEx issued a "GFTP [Guaranteed Fair Treatment Procedure] Complaint Executive Summary," which appears in the form of a human resources review of the conditions surrounding Plaintiff's termination. (R. 26-4: GFTP Summ.) The summary states that Plaintiff had been warned about timecard discrepancies as early as November of 2004; had received written counseling letters regarding supervisees working more than 55 hours per week as early as July of 2004; and had received written counseling letters advising her of problems with her cash handling procedures for the first time in February of 2005. (*Id.*)

On September 20, 2007, Plaintiff filed a *pro se* complaint in the United States District Court for the Western District of Tennessee, alleging racial and gender discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §

2000e-5(g); and age discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*

Defendant moved for summary judgment on March 6, 2009. After conducting a hearing, the district court granted summary judgment to Defendant in an order dated July 24, 2009. Plaintiff now appeals.

## ANALYSIS

Plaintiff argues that the district court erred in granting summary judgment to Defendant because several material facts remain in dispute, namely whether: 1) the Performance Policy mandates, or merely subjects an employee to, termination upon the issuance of three Performance Reminders in a 12-month period; 2) Plaintiff received the March 9, 2005 disciplinary letter as a result of retaliation; and 3) there is a factual basis for the April 5, 2005 Performance Reminder. (Pl.'s Br. at 17–19.) Defendant counters that Plaintiff has failed to present a *prima facie* case on any of her claims. (Def.'s Br. at 25.)

### I.      Standard of Review

We review a district court's grant of summary judgment *de novo*. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). Evidence in the record is viewed in the light most favorable to the nonmoving party, and all reasonable inferences are drawn to the benefit of that party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576–77 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]e liberally construe EEOC charges filed by pro se complainants," *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 490 (6th Cir. 2010), and we extend the same liberal construction to Plaintiff's pleadings, as "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Wade*, 33 F. App'x 750, 756 n.2 (6th Cir. 2002).

"A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008) (citing *Anderson*, 477 U.S. at 248.). Identifying factual disputes that are "irrelevant or unnecessary" will not suffice to defeat summary judgment. *Anderson*, 477 U.S. at 248.

## II.     Race and Gender Discrimination Claims

### A.     Legal Framework

Plaintiff brought her Title VII claims under a "mixed-motive" theory. "[T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." *Baxter Healthcare Corp.*, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e-2(m)).

"In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action."

10

*Id.* Therefore, a plaintiff may prevail under a mixed-motive claim "even though other [non-protected] factors also motivated the [adverse] practice." 42 U.S.C. § 2000e-2(m).

## B.     Discussion

While it is clear that Plaintiff presents sufficient evidence to meet the first prong of the inquiry into mixed-motive discrimination—she was terminated by Defendant, which constitutes an adverse employment action, *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)—Plaintiff fails to show that her protected status was a motivating factor for her termination. Her claim must therefore fail.

As an initial matter, Plaintiff makes no claim that any FedEx employee ever directly made any race-based comment to her, or any comment that she interpreted to be motivated by racial bias. She does not report that she was aware of any overt or covert racism, either at FedEx generally or in relation to her personally. Other than recounting the incident where another FedEx employee demanded to see her identification, and making two generalized statements regarding her perception that she would not have been placed in the positions in which she was placed were she not an African American woman, Plaintiff makes no statement (let alone provides any evidence) that either race or gender were contributing factors to her termination.[3]

---

[3]In addition to the statement that Plaintiff made in her June 17 internal EEO complaint, recounted above, Plaintiff also made the following statement during her deposition:

> I [told Walker that] I felt at that time, I felt like I was discriminated against. I felt like had I been of another race or another gender, I guess is what I felt at that time, I felt like I wouldn't have been in his office having this conversation.

(R. 26-4: Weatherby Dep. at 358.)

11

On the contrary, in her deposition, Plaintiff was asked whether she believed that she received the "performance reminder from April 5, 2005, as a result of discrimination," to which she responded "no." (R. 26-4: Weatherby Dep. at 237.) When asked if she believed that she received the March 9, 2005 Performance Reminder as a result of discrimination, Plaintiff also answered "no." (*Id.* at 208.) When questioned about the incidents that she describes as forming the basis of her feeling that employees and managers at FedEx were hostile to her—a manager named Jennifer Wicks[4] telling Mudd that Plaintiff "wasn't pulling [her] weight," (*id.* at 438); managers Wicks and Carolyn Cox "roll[ing] their eyes" when Plaintiff came into a room, (*id.* at 445); Plaintiff being made to sit next to Shurling at a lunch after her position at MQY had been taken away, (*id.* at 446–47); and Plaintiff being subjected to the whispering and gossiping of other employees, (*id.* at 448)—Plaintiff also stated that she did not believe that the behavior was motivated by her race or her gender.

Plaintiff described only three specific incidents that she attributed to her race. The first incident occurred between Plaintiff, Jennifer Wicks, and Caroline Cox during a telephone conversation. Plaintiff's cellular telephone service dropped a call that the three were having regarding a work matter, and Plaintiff testified that "right after that, the next—it was like this might have happened on a Friday, seems like the following week is when I had the meeting with Susan [Shurling] and Dean [Mudd]." (*Id.* at 440–41.) Because of the proximity of these events, and Caroline Cox's race (Caucasian), Plaintiff attributed this incident to racial bias.

---

[4]Jennifer Wicks is alternately referred to as "Jody," "Jennifer Wills" and "Jennifer Wicks," in both Plaintiff's and Defendant's briefs before this court and in the record. While it appears that these people are one and the same, the record is unclear. For the purposes of simplicity, this opinion refers to all such parties as "Wicks."

Plaintiff also described the reception that she received from Mudd upon returning to her post at BNA after meeting with Walker in Memphis. Plaintiff stated that when she returned to the office, "it was the look on Dean Mudd's face that automatically put me into fear . . . . his facial expression and his body language, it appeared that he was just angry, very upset, that I was coming back." (*Id.* at 442.) Plaintiff attributed Mudd's demeanor to racial bias.

Neither of these incidents rises to a level sufficient for a jury to find a causal connection between Plaintiff's termination and her race. With regard to the first incident, Plaintiff acknowledges that both Cox and Wicks, who is African American, were angry at her during the call. For an unexplained and unsupported reason, Plaintiff attributes Cox's animus to race, and Wicks' to disappointment and frustration regarding Plaintiff's work performance. (*Id.* at 441.) The incident with Mudd fails to show racial discrimination for similar reasons. There is no evidence that Mudd's treatment of Plaintiff upon her return was due to anything other than his anger that Plaintiff had returned to BNA after it had been made clear to her that his preference was that she accept a demotion or move to another position.

Plaintiff lastly described comments made by Mudd in early 2004 that she attributed to gender bias. Plaintiff stated that Mudd "indicate[d] that females always belonged—they don't belong on the operations side; they belong in the office . . . . And he made a statement one time indicating that people that come from corporate are lazy." (*Id.* at 280-81.) Plaintiff interpreted this comment to be discriminatory against both women and people who come from "corporate." But, as Defendant points out, "[t]his one alleged conversation took place a year and a half to two years prior to

13

[Plaintiff's] termination," (Def.'s Br. at 37), and therefore does not rise to the level necessary to create a triable issue for a jury.

In addition to these three specific incidents, Plaintiff alleges general disparate treatment in relation to other operations managers who worked under the supervision of Shurling and Mudd. Plaintiff claimed that she was treated differently from Wicks, Cox, and operations managers Gerald Bailey, Matt Andrysiak, and Doreen Jackson. (*Id.* at 406–11.) Plaintiff presents no evidence regarding, nor did she profess firsthand knowledge of, the discipline or treatment that any of these managers received.

Contrary to Plaintiff's allegation that she was singled out for discipline among the operations managers, the record indicates that Mudd gave written counseling letters and Performance Reminders to several of his subordinates during the period of Plaintiff's employment as an operations manager, including Andrysiak, Bailey, and operations managers John Tubbs and Kelly Costello. (R. 31-15, 31-17.) During the same period, Andrysiak accepted a demotion from operations manager to courier for performance issues, (Def.'s Br. at 20), and Jackson was terminated for cause.[5] (*Id.* at 21.)

Assuming, *arguendo*, that any of these operations managers are similarly situated to and can be compared with Plaintiff, she presents no evidence that other operations managers were not being disciplined, nor does she present any evidence to suggest that the discipline that she received was disproportionate to that received by other managers, or somehow otherwise unwarranted.

_____

[5]Jackson later grieved her termination through the GFT process and was reinstated. (Def.'s Br. at 21.)

14

Finally, the record shows that Defendant followed the procedures set forth in its Performance Policy in its discipline and termination of Plaintiff. (*See* R. 26-4: Performance Policy.) Whether the Performance Policy requires, or merely subjects an employee to, termination upon the issuance of three Performance Reminders in a 12-month period is neither material nor in dispute. There is no indication that Defendant deviated from the Performance Policy, or applied it to Plaintiff in a way that it did not apply it to other employees in her position. And because Plaintiff concedes the factual basis underlying her written counseling letters and Performance Reminders, and concedes that her three Performance Reminders made her subject to termination, Defendant's adherence to the Performance Policy further supports the conclusion that neither race nor sex were motivating factors in Defendant's termination.

Plaintiff's argument on appeal, in which she simply asserts that facts remain in dispute, is insufficient to overcome her failure to meet her burden of presenting a *prima facie* case. *See Baxter Healthcare Corp.*, 533 F.3d at 390 ("The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial."). Because Plaintiff has failed to show that any protected status was a motivating factor for her termination, Plaintiff has failed to present a *prima facie* case of race or gender discrimination in violation of Title VII.

### III. Age Discrimination

#### A. Legal Framework

The Age Discrimination in Employment Act ("ADEA") prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

In a claim of age discrimination supported by circumstantial evidence, a plaintiff must show that, "(1) he [or she] was at least 40 years old at the time of the alleged discrimination; (2) he [or she] was subjected to an adverse employment action; (3) he [or she] was otherwise qualified for the position; and (4) he [or she] was replaced by a younger worker." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008) (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007)). "The fourth element may be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Tuttle*, 474 F.3d at 317 (internal quotations omitted).

If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009) (reiterating that "the *McDonnell Douglas* [411 U.S. 792 (1973)] framework can still be used to analyze ADEA claims based on circumstantial evidence"). Once a non-discriminatory reason has been offered, the burden of production returns to the plaintiff to show that the defendant's legitimate reasons are merely pretextual, and that she was in fact subjected to the adverse action on the basis of her age. Generally, a plaintiff demonstrates pretext by offering evidence that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).

Although the *McDonnell Douglas* framework shifts the burden of production between the plaintiff and the defendant, "[t]he ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This means that "the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the but-for cause of their employer's adverse action.'" *Geiger*, 579 F.3d at 620 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 157, 129 S.Ct 2343, 2351 n.4 (2009)).

"'On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

### B.     Discussion

Defendant argues that Plaintiff failed to establish that, after her termination, she was replaced by a person outside of the her protected class; and that Plaintiff "failed to provide any evidence to support her claim that she was treated less favorably than similarly situated nonprotected employees." (Def.'s Br. at 29.) Alternatively, Defendant argues that it presented legitimate reasons for Plaintiff's termination based on her performance deficiencies, and that Plaintiff failed to establish that those reasons were pretextual. (*Id.* at 29–30.)

Plaintiff does not present any facts or argumentation on appeal to support her ADEA claim or to respond to the determination of the district court. Though this court provides some leeway to *pro se* litigants, Plaintiff must still make some effort at argumentation or presentation of facts on appeal. Under circumstances such as these, where Plaintiff has made no effort to address her claim,

17

the claim is waived. *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) ("It is a settled appellate rule that issues averred to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotations omitted).

Even if Plaintiff had not waived her claim, it could not withstand merits review. Plaintiff has failed to meet her burden of production by showing that her age was a "but for" cause of her termination, that she was otherwise qualified for the position, that she was replaced by a non-protected employee or was treated differently than younger employees, or that the legitimate reasons for her termination articulated by Defendant were pretextual.

As outlined above, Plaintiff conceded the factual basis underlying her written counseling letters and Performance Reminders. Plaintiff's receipt of nine instances of justified discipline after her promotion, (R. 26-4: GFTP Summ.), and her self-assessment that she was "simply put in an environment were [sic] not having prior work experience with no manager to mentor, coach and develop [her] was detrimental to [her] success in [the] position," (R. 31-11: THRC Compl.), tend to also support the conclusion that she was not otherwise qualified for a position as an operations manager.

Plaintiff has also failed to show that she was replaced by a non-protected employee, or that she was treated less favorably than non-protected employees. Defendant states that Plaintiff's job duties were transferred to Costello, with some residual responsibilities having been given to Wicks. (Def.'s Br. at 22, 29.) The record indicates that Wicks was forty-two years old during the relevant period, (R. 31-3: Inter-Office Memo); there is no indiction of Costello's age. Of the operations managers that Plaintiff claimed received more favorable treatment, the record indicates that Cox was

thirty-eight and Gerald Bailey was forty-one. (*Id.*) The record, as well as Plaintiff, remain silent as to the ages of Andrysiak and Jackson.

Plaintiff has made no specific allegations that Cox, the only non-protected operations manager, was treated more favorably than she was, nor has she made an allegation or supplied evidence to show that she was replaced by a younger employee. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'") (quoting *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Consequently, Plaintiff has failed to show that Defendant treated non-protected employees more favorably or replaced a protected employee with a non-protected employee.

Lastly, Plaintiff has failed to present any evidence to suggest that the legitimate reasons offered by Defendant for her termination were pretextual. The rationale provided by Defendant had a basis in fact, was sufficient, and appears, based on a full review of the evidence in the record, to be the actual motivating factor for the adverse employment action. Thus, Plaintiff has failed to present a *prima facie* case of age discrimination in violation of the ADEA.

### IV. Retaliation Claim

#### A. Legal Framework

Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or

because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Similarly, the ADEA prohibits discrimination against an employee in retaliation for "oppos[ing] any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

Both Title VII and ADEA retaliation claims are analyzed under the familiar *McDonnell Douglas/Burdine* framework, when such claims are supported by circumstantial evidence. *See Spengler*, 615 F.3d at 491. Under this framework, a plaintiff may establish a *prima facie* case of illegal retaliation by showing that "(1) she engaged in [protected activity]; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

If the plaintiff can make this showing, then "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer can articulate such a reason, then the plaintiff is required to "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

### B.     Discussion

Plaintiff argues that the fact that Defendant terminated her while she had an internal EEO complaint pending, in what she claims is violation of FedEx policy, and the temporal proximity of her termination to the filing of that complaint, both serve to show causation sufficient to sustain her retaliation claim.  Defendant argues that Plaintiff has failed to present evidence, other than temporal proximity, of a causal connection between her protected activity and her termination; and alternatively, that Plaintiff has "conceded the factual basis and the legitimacy of defendant's nondiscriminatory reason for her termination," and so is incapable of showing pretext.  (Def.'s Br. at 43.)

We hold that Plaintiff's retaliation claim also lacks merit.  As to her first argument, Plaintiff fails to point to anything in the record, or supply a copy of any policy, that bars Defendant from terminating or otherwise disciplining an employee during the pendency of an internal EEO complaint.[6]  Secondly, the record indicates that Plaintiff's June 17, 2005 internal EEO complaint had already been resolved, by way of the August 1, 2005 internal memorandum, by the time Defendant was terminated on August 18, 2005.  Therefore, even if FedEx had the policy that Plaintiff claims, Plaintiff has failed to show that it was violated by Defendant in the course of her termination.

Addressing Plaintiff's final argument, this court has held that "a causal connection for purposes of establishing a prima facie case of retaliation can be shown 'through knowledge [of the complaints] coupled with a closeness in time that creates an inference of causation . . . .  However,

---

[6]FedEx appears to have a policy that might address this issue—the "5-50 Guaranteed Fair Treatment Procedure/EEO Complaint Process" policy—but no copy is supplied in the record.

temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'" *Imwalle*, 515 F.3d at 550 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). In this case, there is no evidence other than temporal proximity to support Plaintiff's claim.

By the time Plaintiff filed her June 17, 2005 internal EEO complaint, the factual basis underlying her third Performance Reminder already existed, and the decision regarding her continued employment with FedEx had been placed on hold by Mudd and Shurling pending her meeting with Walker. Therefore, the timeline strongly supports the implication that, by the time Plaintiff filed the July 17 complaint, her termination was already a foregone conclusion and as such cannot be attributed to retaliation. All of Plaintiff's other protected actions—the filing of the second internal EEO complaint, the filing of the GFT complaint wherein she alleges retaliation, and the filing of the external EEOC complaint—occurred after her termination and so cannot form the basis of the protected activity for which Plaintiff claims she experienced retaliation through termination. *See Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 628 (6th Cir. 2008) ("[A]n employee's protected activities will be the cause of an employer's retaliatory conduct only where the employer knew of those protected activities.").

Plaintiff cannot prevail on her claim of hostile work environment because she has failed to show that she was the victim of harassment at FedEx, based either on race, sex, age or retaliation. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). Nor has she shown that what harassment she experienced, if any, was "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Williams v.*

*Gen. Motors Corp.*, 187 F.3d 553, 560, 562 (6th Cir. 1999) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). Instead Plaintiff points to a handful of incidents, outlined above, involving other operations managers making comments regarding her performance, "roll[ing] their eyes" at her, and whispering about her during a meeting. (R. 26-4: Weatherby Dep. at 438–48.) The infrequency of the uncomfortable or unwelcomed incidents experienced by Plaintiff, and their relatively mild nature, do not rise to the level required to sustain a hostile work environment claim at the summary judgment stage.

Because Plaintiff has failed to demonstrate a causal connection between her protected action and her termination, and failed to present evidence that she experienced severe and pervasive harassment in retaliation for engaging in a protected action, the district court did not err in granting summary judgment for Defendant on Plaintiff's claims of retaliation and hostile work environment.

## CONCLUSION

For the reasons stated herein, the judgment of the district court is **AFFIRMED.**